OPINION OF THE COURT
Chief Judge Wachtler.
On these two appeals, we consider whether surveillance *190 films prepared by a defendant in a personal injury action are discoverable by the plaintiff before trial. Surveillance films can serve a uniquely compelling function in a personal injury trial. They are designed to undermine, in a potentially sensational manner, a plaintiff’s claims that he or she was seriously injured. At the same time, however, visual images are easily manipulated and can, as the result of skillful editing or crafty camera work, give a false depiction of a plaintiff’s condition. Defense counsel argues that only by permitting a defendant to spring these films on the plaintiff at trial will the truth-seeking function of cross-examination be safeguarded. Plaintiffs’ counsel, on the other hand, argues that because films are so easily manipulated, they must be disclosed before trial in order to permit counsel to verify the accuracy of the images portrayed.
At its most basic, this controversy requires us to fashion a rule that respects a defendant’s qualified right to keep videotapes prepared in anticipation of litigation private, but that at the same time advances the policy of liberal disclosure underlying CPLR article 31. The Appellate Division held in both of these cases that the defendants would be obligated to disclose only those tapes which they planned to use at trial. Under the facts present here, we find this balance to be an appropriate one. Accordingly, in DiMichel v South Buffalo Railway Company, we affirm. In Poole v Consolidated Rail Corporation, however, because of trial errors we will discuss below, we reverse and remit for a new trial on both liability and damages.
I. DiMichel v South Buffalo Railway Company
Plaintiff Anthony DiMichel commenced this action against South Buffalo Railway Company (South Buffalo) in Supreme Court, Erie County, by service of summons and complaint dated January 16, 1986. Plaintiff alleged that on June 6, 1984, while employed by South Buffalo, he sustained injuries in a fall. DiMichel charged South Buffalo with violations of the Federal Employers’ Liability Act, the Safety Appliance Act and the Boiler Inspection Act and asked for $500,000 in damages.
In the course of pretrial discovery, plaintiff asked for disclosure of all videotapes or surveillance films that defendant may have taken of plaintiff. Without conceding that it in fact possessed surveillance materials, South Buffalo contended that *191 any such material was not discoverable. Plaintiff then moved to compel disclosure. The trial court denied this motion.
Plaintiff moved to reargue the motion to compel after the Appellate Division, First Department, held such films to be discoverable in Marte v Hickok Mfg. Co. (154 AD2d 173). Upon reargument, the motion to compel disclosure was granted and defendant was ordered "to turn over to plaintiff for inspection and copying any and all videotapes and/or surveillance films of the plaintiff,” but stayed this order pending appeal to the Appellate Division. The Appellate Division modified, with two Justices dissenting, holding that the defendant was obligated to turn over those surveillance materials it intended to use at trial, and that the defendant would be precluded from using any surveillance material it did not supply to plaintiff within 60 days of its order. The Appellate Division stated that the surveillance material constituted material prepared for litigation, "discoverable upon a showing that the party seeking discovery has a substantial need of the materials in preparation of the case and is unable without undue hardship to obtain their substantial equivalent by other means” (178 AD2d 914, 915, citing CPLR 3101 [d] [2]). The two dissenters would have held that plaintiff had failed to show factually that he had a substantial need for the material or that he was unable without undue hardship to obtain its equivalent. Defendant moved the Appellate Division for leave to appeal to this Court, and the Appellate Division certified the following question: "Was the order of this Court entered December 26, 1991 properly made?”
II. Poole v Consolidated Rail Corporation
Plaintiff David Poole commenced this action in Supreme Court, Erie County, against his employer, Consolidated Rail Corporation (Conrail), charging that he had been seriously injured as the result of an August 22, 1985 fall from an allegedly defective ladder. In his verified complaint dated August 21, 1986, Poole alleged that Conrail had failed to provide plaintiff with a safe place to work and had failed to ensure that there were proper safety features on the job. Plaintiff asked for $1 million in damages, but in an amended complaint dated April 10, 1990, plaintiff increased the amount of damages sought to $5 million.
In the course of pretrial discovery, plaintiff served a notice to produce dated November 20, 1989, which directed Conrail *192 to turn over "all surveillance films, photographs, videotapes and related materials concerning * * * surveillance.” Defendant moved for a protective order, but this motion was denied, and in an order dated June 8, 1990, plaintiff’s request to view all surveillance films produced by defendant was granted.
At trial, plaintiff produced medical evidence to support his claims that he had sustained permanent and serious injury to his back as a result of the accident. Further, plaintiff introduced evidence to establish that the accident had rendered him impotent. Defendant did not enter any surveillance material into evidence. The jury found in favor of plaintiff and awarded him $4,152,000 in damages.
Conrail appealed to the Appellate Division, which affirmed, with two Justices dissenting. The Appellate Division, citing DiMichel, which was decided at the same time, held that the lower court ruling that plaintiff was entitled to all surveillance material was too broad and should have been confined to that surveillance material which defendant had intended to use at trial. The Court deemed this error to be harmless, however, "because the evidence of defendant’s liability and plaintiff’s damages was overwhelming and because defendant suffered no prejudice by the court’s ruling” (178 AD2d 941, 942). The dissenting Justices would have held that the award deviated materially from what was. reasonable compensation (CPLR 5501 [c]) and would have awarded defendant a new trial on damages. The defendant appealed to this Court as of right (CPLR 5601 [a]).
III.
As a preliminary matter, we note that, because of the procedural posture of each of these cases, the question before us is a rather narrow one. In each case, as noted above, the Appellate Division held that defendants had to turn over only those surveillance tapes that they intended to use at trial. Defendants appealed from this decision in both cases. Because any broadening of the scope of discovery authorized by the Appellate Division would, in effect, grant affirmative relief to plaintiffs, who are not appellants here (Hecht v City of New York, 60 NY2d 57, 63), we cannot consider plaintiffs’ arguments that they are entitled to view every surveillance film that defendants may have taken, regardless of whether defendants intend to use the films at trial.
Having acknowledged this procedural constraint, we now *193 turn to the unique problems posed by surveillance films. Personal injury defendants secure surveillance materials in order to verify the extent of a plaintiff’s purported injuries and introduce them because they are powerful and immediate images that cast doubt upon the plaintiff’s claims. And indeed, if accurate and authentic, a surveillance film that undercuts a plaintiff’s claims of injury may be devastatingly probative. At the same time, however, film and videotape are extraordinarily manipulable media. Artful splicing and deceptive lighting are but two ways that an image can be skewed and perception altered. As one court has noted, "[t]he camera may be an instrument of deception. It can be misused. Distances may be minimized or exaggerated. Lighting, focal lengths, and camera angles all make a difference. Action may be slowed down or speeded up. The editing and splicing of films may change the chronology of events. An emergency situation may be made to appear commonplace. That which has occurred once, can be described as an example of an event which recurs frequently * * * Thus, that which purports to be a means to reach the truth may be distorted, misleading, and false” (Snead v American Export-Isbrandtsen Lines, 59 FRD 148, 150).
Thus, while an accurate surveillance film may indeed prove to be a bombshell, the possibility of inaccuracy, given the nature of the medium, is very real. In resolving the question now before us, then, it is important to note that New York has long favored open and far-reaching pretrial discovery. To a large extent, New York’s open disclosure policy was intended to mark an end to the presentation of totally unexpected evidence and to substitute honesty and forthrightness for gamesmanship. To that end, CPLR 3101 (a) provides that "[t]here shall be full disclosure of all evidence material and necessary in the prosecution or defense of an action, regardless of the burden of proof.” In Allen v Crowell-Collier Publ. Co. (21 NY2d 403, 407), this Court held that, in light of the statute’s purpose and legislative history, "[t]he words, 'material and necessary’, are * * * to be interpreted liberally to require disclosure, upon request, of any facts bearing on the controversy which will assist preparation for trial by sharpening the issues and reducing delay and prolixity. The test is one of usefulness and reason” (see also, Rios v Donovan, 21 AD2d 409, 411 ["The purpose of disclosure procedures is to advance the function of a trial to ascertain truth and to accelerate the disposition of suits”]).
Courts in this State that have considered the discoverability *194 of surveillance tapes have turned to two separate subdivisions of CPLR 3101: CPLR 3101 (d) (2) and CPLR 3101 (e) (see, e.g., Lorino v Manhattan & Bronx Surface Tr. Operating Auth., NYLJ, Mar. 15, 1990, at 24, col 5 [CPLR 3101 (d) (2)]; Prewitt v Beverly-50th St. Corp., 145 Misc 2d 257 [both]). CPLR 3101 (d) (2) provides that materials otherwise discoverable under subdivision (a) which were prepared in anticipation of litigation or for trial are obtainable only upon a showing that "the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means” (emphasis added). CPLR 3101 (e), unlike subdivision (d) (2), is in no way qualified; it gives a party an absolute right to obtain a copy of his or her own statement.
The first surveillance film case to reach the Appellate Division was Marte v Hickok Mfg. Co. (supra). In Marte, the Appellate Division, First Department, held that surveillance tapes were discoverable because they constituted statements of the plaintiff under CPLR 3101 (e) (id., at 177). In reaching its decision, the Appellate Division cited an earlier decision, Saccente v Toterhi (35 AD2d 692), in which the Appellate Division had held that a photograph of the plaintiff that had been taken a short time after the accident in question, some four years before trial, was a visual or photographic statement made by plaintiff, and therefore discoverable under subdivision (e) (id.).
The Appellate Division, Fourth Department, expressly refused to follow the lead of the First Department in one of the two cases now before us, DiMichel v South Buffalo Railway Company. The Court declined to consider surveillance films as statements for purposes of CPLR 3101 (e), instead treating them as material prepared for litigation to which a qualified privilege attached (CPLR 3101 [d] [2]). In concluding that the material was discoverable, the Court held that the substantial need and undue hardship requirements had been satisfied: "[i]t cannot be gainsaid that plaintiff has a substantial need for discovery of the surveillance materials based on the fact that 'visual reproductions may not always provide a correct picture of what they purport to depict since they are subject to manipulation’ * * * For that same reason, it is impossible for plaintiff to obtain the substantial equivalent of the surveillance materials by other means” (id., at 915, quoting Marte v Hickok Mfg. Co., supra, at 176, and citing Snead v American Export-Isbrandtsen Lines, 59 FRD 148, supra).
*195 In Careccia v Enstrom (174 AD2d 48), the Appellate Division, Third Department, agreed with the Fourth Department that surveillance tapes were not party statements for purposes of CPLR 3101 (e), but were instead material prepared in anticipation of litigation under CPLR 3101 (d) (2). The Court held that surveillance videotapes were analogous to the statements and reports of an investigator hired by defendant to observe plaintiff’s activities, which fall within the scope of CPLR 3101 (d) (2) (id., at 50). Expressly disavowing the Fourth Department’s holding in DiMichel, however, the Third Department stated that since the party seeking discovery has the burden of proving substantial need and hardship (see, e.g., Thibodeau v Rob Leasing, 88 AD2d 1085), the Court was "unwilling to conclude that the elements necessary for an order for production under CPLR 3101 (d) (2) are inherent in the very nature of the visual evidence, for such a conclusion would effectively rewrite the statute to create another exception to the rule governing material prepared for litigation * * * which is the function of the Legislature, not the courts.” Specifically, the Court rejected the argument that the plaintiff had a substantial need for disclosure in order to verify the accuracy of the videotape, holding that authenticity could be verified through voir dire and cross-examination of the person who had made the videotape (Careccia v Enstrom, supra, at 51).
Finally, the Appellate Division, Second Department, has also held that surveillance films constitute material prepared for litigation to which a qualified privilege attaches (Kane v Her-Pet Refrig., 181 AD2d 257). That Court, however, agreed with the analysis of the Appellate Division, Fourth Department in DiMichel, holding that "[although surveillance evidence constitutes material obtained in preparation for litigation, its protected status is overcome here by the plaintiffs’ substantial need to verify the accuracy of the potentially devastating films prior to trial”. (Id., at 265.)
This is clearly an issue that has fragmented the four departments of the Appellate Division. To review briefly, the First Department would treat surveillance films as discoverable in their entirety pursuant to CPLR 3101 (e), which governs party statements. The Second Department followed the lead of the Fourth Department in DiMichel by treating surveillance films as material prepared for litigation and by holding that sub *196 stantial need and undue hardship inhered in the nature of the films themselves. Finally, the Third Department, while also treating these films as material prepared for litigation, held that such films were discoverable only upon a showing of substantial need and undue hardship.
Having considered the different approaches, we agree with the Second, Third and Fourth Departments that surveillance films should be treated as material prepared in anticipation of litigation, and as such, are subject to a qualified privilege that can be overcome only by a factual showing of substantial need and undue hardship.
That the plaintiffs in both of these cases have a substantial need to view surveillance films before trial is manifest. Because films are so easily altered, there is a very real danger that deceptive tapes, inadequately authenticated, could contaminate the trial process. The question that remains, therefore, is whether plaintiffs confronted with surveillance films for the first time at trial would have an adequate opportunity to ascertain the films’ accuracy and authenticity. The dissenters in DiMichel and the Third Department in Careccia believed so, reasoning that surveillance films could be authenticated at trial through voir dire or cross-examination of the person who had made the film. On balance, however, we disagree. Authentication of surveillance films can be a slow and painstaking process, and because of the potentially devastating effects of such evidence, it would be improper to curtail a plaintiff’s efforts to do so. Thus, a plaintiff, confronted with a surveillance film at trial, would certainly be entitled to a continuance to examine the video evidence. Indeed, it would appear to be well within the discretion of a Trial Judge, under certain circumstances, to give plaintiff an extended continuance in order to retain an expert who could ascertain the authenticity of proffered video evidence. Thus, if defendants were allowed to withhold surveillance evidence until trial, personal injury trials could be routinely disrupted and delayed.
Further, a plaintiff confronted with altered video evidence for the first time at trial would likely be prejudiced by the apparent weight and authority of such evidence. Even if after careful examination plaintiff was able to demonstrate that the evidence had indeed been distorted, it would be difficult to undo its initial impact and to erase the impression left in the minds of the jury members.
*197 Defendants dispute plaintiffs’ claims of substantial need, arguing that the real reason they seek to obtain the tapes prior to trial is to learn what evidence the defendants intend to produce at trial so that they may tailor their trial testimony accordingly. This, defendants argue, would greatly impair the truth-finding function of cross-examination. This argument, however, is flawed for at least two reasons. First, it runs counter to New York’s open pretrial disclosure policy, as discussed earlier. Clearly, to permit defendants to withhold this evidence until trial, even for the ostensible purpose of promoting vigorous cross-examination, would be to return to an earlier time, when subterfuge and surprise were common trial strategies. Second, it is persuasive only if we assume that surveillance tapes are always accurate and plaintiffs always dishonest. As noted above, however, surveillance films are extraordinarily susceptible to manipulation, and, once altered, are peculiarly dangerous. Thus, we cannot fashion a rule that is premised upon their authenticity, as defendants urge. However, the danger identified by defendants is a real one. We believe that it can be largely eliminated by providing that surveillance films should be turned over only after a plaintiff has been deposed.
We further find that plaintiffs have established that they cannot without undue hardship obtain the substantial equivalent of surveillance materials by other means. Although plaintiffs are aware of their own physical ailments and the nature of their disabilities, this is no substitute for viewing the surveillance materials taken by the defendants. It is only by viewing the surveillance film that plaintiffs can determine when it was made and whether the activities depicted were typical of that time or were the product of an emergency situation. Visual evidence of this kind is unique because it memorializes a particular set of conditions that can likely never be replicated. Only by observing the conditions as they appear on film can the plaintiffs respond to possible distortions or prepare to explain seeming inconsistencies to the jury. Thus, we conclude that the second prong of CPLR 3101 (d) (2) has also been satisfied.
In DiMichel v South Buffalo Railway Company, the sole issue was the discoverability of the surveillance tapes. Having concluded that the plaintiff was entitled to view those tapes that the defendant intended to use at trial, if indeed any such tapes exist, our analysis in that case is at an end. Accordingly, *198 the order of the Appellate Division should be affirmed and the certified question answered in the affirmative.
One issue remains to be discussed in Poole v Consolidated Rail Corporation, however. Having examined the record and considered the parties’ arguments, we remain greatly troubled by both trial tactics employed by plaintiffs counsel in this case and certain rulings made by the Trial Judge. Although the Appellate Division concluded the lower court had erred in ordering full discovery of all surveillance tapes, the Appellate Division, in conducting its harmless error analysis, found the trial errors cited by defendant not so egregious as to require a new trial. We disagree. We believe that these errors permeated the trial and created a climate of hostility that effectively destroyed the defendant’s ability to obtain a fair trial.
We are most troubled by three separate errors. The first relates directly to our decision regarding the discoverability of the surveillance tapes. As we noted earlier, the defendant here did not introduce surveillance material into evidence at trial. Plaintiff’s counsel, however, referred specifically and repeatedly to the fact that such films had been taken. In fact, in his summation, plaintiff’s attorney alluded to the existence of surveillance films and theorized that the defense did not introduce the surveillance tapes into evidence because they did not support the defendant’s case. This tactic was the subject of a mistrial motion brought by defendant’s counsel upon the completion of the summation.
This conduct was highly prejudicial, and, we conclude, improper. Defendant was, as the dissent noted, "twice injured by the court’s ruling that permitted the jury to speculate about what the tapes depicted and permitted it to infer that, if the tapes had been produced, they would have supported plaintiff’s contentions” (178 AD2d, at 943, supra).
More fundamentally, however, we are troubled by these tactics because they unravel the careful compromise we have crafted today. In holding that the plaintiff here was entitled to obtain those surveillance materials that defendant planned to use at trial, on direct or cross-examination, we have attempted to reconcile defendant’s interests in keeping matter prepared in anticipation of litigation private with plaintiff’s need to authenticate easily distorted visual evidence. We have been guided by a policy of liberal disclosure, and we seek above all else to ensure that both plaintiff and defendant receive a fair trial.
*199 Plaintiffs counsel here appears to have used this spirit of openness and liberality as a cover for tactics that effectively undermined the ultimate fairness of this trial. Defendant decided, for whatever reason, that the surveillance tapes did not help his case. That should have ended the matter. To permit the plaintiff to profit from his knowledge of the content and existence of such tapes in this manner would enable him, by virtue of open pretrial disclosure, to engage in the sort of gamesmanship that we are seeking to discourage in the defendant. Thus, we hold as a matter of law that where surveillance films have been duly turned over to the plaintiff pursuant to our decision today, and the defendant decides subsequently, as a matter of trial strategy, not to use such films at trial, plaintiff cannot turn this strategy to his or her advantage and comment on this decision to the jury.
The second error does not relate to the surveillance film issue, but is, in our opinion, more egregious. Defense counsel had been unable to produce at trial the man who had served as Conrail’s foreman at the time of the accident because he was undergoing open heart surgery. Defense counsel sought to introduce medical evidence to this effect to the jury, but the trial court sustained the plaintiff’s objections. At trial, plaintiffs counsel elicited testimony from a Conrail employee that the foreman had ordered him to destroy the ladder from which the plaintiff had fallen. In his summation, he repeatedly portrayed the foreman as reluctant to talk about the case and went so far as to argue that defendant did not produce the foreman in an effort to cover up the real facts behind the accident. An objection to the latter point was sustained, and the jury instructed to ignore it, but in his mistrial motion, defendant’s counsel referred specifically to these comments and to the court’s having prevented defendant from revealing to the jury the real reason behind the foreman’s inability to appear.
These references in counsel’s closing statement and the court’s decision precluding the admission of medical testimony were both clearly improper. We find that they too contributed to a climate of hostility that acted to deprive the defendant of a fair trial.
Lastly, we agree with the dissenters below that the Trial Judge abused his discretion when he prevented the defendant’s experts from testifying as to the amount that plaintiff could have been expected to earn from alternative employ *200 ment. Prior to trial, defendant had sought to have plaintiff examined by its vocational expert, but the court granted plaintiff’s motion for a protective order. During cross-examinatian of this expert, however, plaintiff’s counsel repeatedly attempted to discredit this expert based upon his failure to have conducted such an examination and his consequent reliance upon documentation provided by defendant. Thus, not only was the defense precluded from offering relevant evidence regarding plaintiff’s future earning power, but this error was compounded by plaintiff’s efforts to portray the vocational expert’s testimony as incomplete and unreliable because of the expert’s failure to conduct an examination that was adamantly and successfully opposed by plaintiff.
We believe that these errors, taken together, deprived defendant of a fair trial and cannot be considered harmless. Under the facts present here, the trial court abused its discretion in denying defendant’s motion for a mistrial.* The defendant is therefore entitled to a new trial on both liability and damages. Because we reverse and remit for a new trial, we do not reach defendant’s other claims.
Accordingly, in DiMichel v South Buffalo Railway Company, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative. In Poole v Consolidated Rail Corporation, the order of the Appellate Division should be reversed, with costs, and a new trial granted.
Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
In DiMichel v South Buffalo Ry. Co.: Order affirmed, etc.
In Poole v Consolidated Rail Corp.: Order reversed, etc.

 To the extent that our decision in Reehil v Fraas (197 NY 64) states that exceptions to improper summation comments raise no question of law reviewable by this Court, it is no longer to be followed.