OPINION OF THE COURT
David Goldstein, J.
The case presents a novel issue relating to the nature and extent of disclosure which may properly be accorded to a party in conjunction with the production of surveillance tapes and whether, on this record, defendants may conduct a second examination before trial of the plaintiff. The surveillance here took place while the case was on the Trial Calendar, at times between one year and one year and four months after plaintiffs deposition, an examination which defendants concede was full and complete in all respects.
The action, sounding in medical malpractice, was commenced to recover for defendants’ failure to properly treat plaintiff for a fracture of the right wrist, which she sustained in a hit-and-run accident on May 2, 1991. She claims, inter alia, that defendants failed to reduce the fracture to obtain optimum alignment and, as a result, there was a malunion of the wrist, which left her totally disabled, unable to use that extremity.
Plaintiff was deposed on May 24, 1993, following which a note of issue was filed, with the case placed upon the Trial Calendar on December 7, 1993. Included in the record is the transcript of plaintiffs examination before trial, which covers 167 pages and which, both parties concede, was a full and complete examination.
Subsequently, while the action was on the calendar, waiting to be reached, defendants conducted surveillance of the plaintiff and, on September 12, 1994, served a notice of surveillance films, stating that they would make the tapes available to plaintiff after she was deposed, an event to which plaintiff would not agree, since a prior complete examination was held more than one year before the surveillance.
During a pretrial conference, the existence of the surveillance tapes was disclosed, whereupon the action was "marked off” the calendar to permit counsel the opportunity to fully litigate the issue. These motions were then brought by plaintiff to direct defendants to produce the surveillance tapes, without the need for a further examination. Defendants cross-moved to condition production of the tapes upon plaintiff’s submission to an additional examination.
*241 On June 2, 1995, the court directed that the tapes be submitted for an in camera inspection, necessary as to whether the original examination adequately dealt with the nature and extent of the injuries in relation to what was depicted on the tapes. Although defendants claim that the examination would not be duplicative and would only cover events subsequent to the original examination, plaintiff contends that an additional deposition would be both unfair and inconsistent with the scope of disclosure authorized by any reported decision.
The disclosure of surveillance tapes has received recent judicial attention, albeit no reported decision appears to deal with the issue in the context in which it is raised in this case and, to that extent, the determination here is one of first impression as to the nature and scope of disclosure under CPLR 3101 (i).
In DiMichel v South Buffalo Ry. Co. (80 NY2d 184), the Court of Appeals fashioned a rule to accommodate the defendant’s qualified right to keep private videotapes which were prepared in anticipation of or during litigation, and the prevailing policy of liberal disclosure which underlies CPLR article 31. In doing so, it resolved a conflict among the Appellate Divisions, adopting the holding of the Fourth Department in DiMichel (178 AD2d 914), adhered to by the Second Department in Kane v Her-Pet Refrig. (181 AD2d 257). It recognized that surveillance films pose unique problems, not only in terms of the "devastatingly probative” quality of such films in relation to plaintiff’s claims, but also the potentially manipulative nature of the media and the time needed to prepare to meet an offer of such films in evidence. Thus, the Court held that "surveillance films should be turned over only after a plaintiff has been deposed”. (80 NY2d, at 197, supra.)
Of course, DiMichel (supra) did not deal with the nature or extent of the examination, nor the need or desire to take multiple depositions. All that the Court did is consider the "narrow” question presented on the appeal, concluding that, although surveillance films were material prepared for litigation, thus qualifiedly privileged, plaintiff had a manifest need to view them in advance of trial, necessary to ascertain the accuracy and authenticity of the films, and thereby fully prepare for trial. However, to avoid the possibility of a party tailoring his or her testimony by what was revealed through surveillance, the Court did take cognizance of a defendant’s compelling need to examine a plaintiff before disclosing the contents of the tapes (80 NY2d, at 197, supra).
*242 In 1993, the Legislature enacted CPLR 3101 (i) (L 1993, ch 574, § 1) to codify DiMichel (supra) and to answer the question left open by the Court of Appeals in that case, directing that a party must disclose all tapes, not just those parts to be relied upon or to be introduced in evidence at trial. Although the statute did not address the issue of the conduct of depositions, this legislative silence should not be construed as a disagreement with or rejection of the holding in DiMichel that production should take place only after plaintiff has been deposed. Plainly, the statutory provision did not deal with nor preclude the court from regulating the time of production (see, Boulware v Triborough Bridge & Tunnel Auth., 161 Misc 2d 435, 437-438; Napolitano v Baldwin Transp. Corp., NYLJ, Sept. 1, 1995, at 27, col 3). As was recently observed by one commentator, "the rule enumerated by the Court in DiMichel is fundamentally fair, and * * * the courts, pursuant to their broad power to prevent abuse and condition discovery under CPLR 3103, should enforce the DiMichel limitation.” (Lipshie, Surveillance Tape Disclosure: Courts Explain Legislative Intent, NYLJ, Oct. 6, 1995, at 1, col 1.)
Thus, while I agree that DiMichel (supra) directs, and principles of elementary fairness mandate, that an examination before trial be held before production of surveillance tapes, this does not necessarily mean that a party is entitled to multiple examinations merely because surveillance has taken place. In my view, the answer lies in a case-by-case analysis, clearly dependent upon the individualized facts and circumstances of the case. The mere fact that there has been surveillance or additional surveillance does not automatically carry with it the necessity of a new deposition, on each and every occasion. If it did, the procedure could be effectively used to thwart and delay the trial, since the necessity of an examination might also necessitate the removal of a case from the Trial Calendar, as was done here, pending such pretrial proceedings.
Unquestionably, this can result in substantial delay. In a given case, the time for disclosure, the conduct of a further examination and any motions in relation to surveillance, as well as any appeal therefrom, could consume a significant amount of time, during which the trial could not proceed. This is evidenced by the present case, where, on request of both sides, notwithstanding that the case had been on the Trial Calendar since December 1993, the action was removed from the calendar on November 30, 1994, in order to litigate the issue of *243 surveillance, which had been conducted in the summer and fall of that year. Nevertheless, the motion and cross motion were not served until March and April 1995; the matter was not submitted to the court until May 1995; and, notwithstanding the June 2, 1995 order which directed an in camera inspection, the tapes were not delivered to Chambers until 31/2 months later, on September 20, 1995. Plainly, there is a potential for abuse, which must be addressed, especially if one takes into account that there may be multiple surveillance episodes.
Only a few reported decisions have considered the issue, each ever so lightly. None have addressed the question in the context in which it is raised in this case. Nor have any formulated or fashioned a workable rule so as to afford necessary guidance to our trial courts. Nevertheless, notwithstanding the absence of a definitive rule by any court, what should emerge as the operative standard and procedure may be gleaned from certain appellate decisions.
In Kane v Her-Pet Refrig, (supra), decided prior to the Court of Appeals determination in DiMichel (supra), the Appellate Division, Second Department, recognized the "defense’s legitimate concern” that an injured plaintiff could tailor his testimony if disclosure preceded an opportunity to fully depose plaintiff as to the claimed disabilities, thus memorializing the individual’s testimony for purposes of impeachment (Kane v Her-Pet Refrig., supra, 181 AD2d, at 263, 268; see also, Marte v Hickok Mfg. Co., 154 AD2d 173, 177). The Court observed that, although the plaintiff in Kane had already been deposed, it could not ascertain from the record whether there was "a sufficient opportunity to examine him with regard to the claimed disabilities and to explore any inconsistencies that the films reveal.” (181 AD2d, at 268, supra.) Thus, it permitted defendant, if necessary, to move for an extension of time to conduct a further deposition of the plaintiff with respect to the claimed disabilities.
In Marte (supra), since the party making the surveillance films had already conducted "an extensive examination before trial of plaintiff regarding his injuries and disabilities * * * caused plaintiff to be examined by its physicians and * * * received authorization to obtain plaintiffs medical records” (supra, at 177), the Appellate Division, First Department, merely ordered disclosure of the surveillance films, directing that, if they were not produced within 60 days, defendants would be precluded from making use of them at trial.
*244 In Rogers v City of New York (184 AD2d 276), the First Department affirmed an order which had directed plaintiff to appear for a further examination before trial, as a condition to production of a surveillance tape, observing, (1) there had been a gap of nine months between the original deposition and the video surveillance, (2) at the time plaintiff was directed to appear for deposition, he had not yet been examined by defendant’s doctor, nor had authorizations been furnished, and (3) the trial court intended to conduct an in camera review of the video in order to limit the scope of the examination.
From the foregoing, the operative standard and procedure clearly appears, especially if one bears in mind the underlying purpose of a deposition in advance of disclosure of surveillance films. The prime function is to afford a sufficient opportunity to examine plaintiff as to the claimed injuries and disabilities, explore any inconsistencies between what is claimed and what is reflected in the films, and memorialize plaintiff’s testimony for purposes of impeachment. Once this has been done, the deposition has effectively served its purpose and any further examination would be duplicative and unnecessary and could be abusive.
In a case where there has been no prior examination, it is palpably clear that, if requested, a deposition must be furnished before disclosure of the films. The more difficult situations are those where there has been a prior deposition before any surveillance. In such instances, the court must conduct an in camera inspection of the surveillance films, to view what is depicted there in relation to the claims in the deposition, in order to ascertain whether defendant had been afforded a meaningful opportunity to examine plaintiff as to the nature and extent of the claimed injuries.
Although the interval or time gap between the deposition and the surveillance may be relevant and may have a bearing upon the issue, it is not necessarily dispositive. Thus, in a case where there has been an extensive examination — a full and complete deposition — which adequately explored the nature and extent of plaintiff’s limitations and restrictions, as to what the party could or could not do in terms of daily routine, and where the films portray plaintiff doing precisely what the party says he or she is unable to do, a further examination would be unnecessarily wasteful, time consuming and, under the circumstances, abusive. Nor, in that limited situation, would it be consistent with the central purpose which underlies our liberal disclosure rules.
*245 While I recognize the latter situation as an exception to what should be the prevailing rule, in my view, this is such a case. As noted, the examination here was extensive, transcribed in 167 pages. Although there was more than a one-year gap between the deposition and the surveillance, the examination covered in detail the nature and extent of the injury, as well as specifics as to plaintiffs, inability to perform her daily routine and activities.
Moreover, the court has carefully reviewed the tapes, which were produced pursuant to an order directing an in camera inspection. In the main, the films depict plaintiff performing several of the precise activities which she had testified she was unable to do. Under such circumstances, I cannot perceive why a defendant would seek to give a plaintiff an additional opportunity to offer an explanation. In any event, inasmuch as there was an extensive examination here, which pursued in detail the nature and extent of the disability, neither DiMichel (supra) nor the equitable principles which underlie our disclosure rules authorize a second examination, merely because there was surveillance. This is especially so where, as here, realistically, defendant does not need another examination, since the first deposition afforded an opportunity to fully examine plaintiff as to the injuries.
In my view, any other holding on the facts of this case would result in a perversion of the usual rules pertaining to discovery and inspection. It would also unnecessarily delay the trial during a litany of repetitive disclosure practices. This would be improper, wasteful and unduly burdensome.
Our discovery rules have never been interpreted in such manner. As has been observed, the underlying purpose of disclosure, which is to be interpreted liberally, is to "assist preparation for trial by sharpening the issues and reducing delay and prolixity. The test is one of usefulness and reason.” (Allen v Crowell-Collier Publ. Co., 21 NY2d 403, 406.) And, as was observed in Rios v Donovan (21 AD2d 409, 411), "the purpose of disclosure procedures is to advance the function of a trial to ascertain truth and to accelerate the disposition of suits”. This rational construction and application may not be extended to a situation as that in this case, where further proceedings would be both harsh and unjust.
Accordingly, upon the foregoing, plaintiff’s motion for an order directing defendants to furnish and turn over the surveillance tapes of the plaintiff is granted. The tapes shall be delivered to plaintiff’s attorneys within 30 days after service of *246 a copy of this order with notice of entry. Upon failure to produce the tapes as directed, defendants shall be precluded from using or offering the tapes at trial. The cross motion for a protective order, conditioning turnover of the tapes upon plaintiff submitting to a further, limited examination before trial, is denied in accordance with the foregoing. The original tapes, which were submitted for an in camera inspection, are in Chambers and may be obtained by defense counsel.