[21 NYS3d 78]

Manuel Bermejo, Respondent, v New York City Health and Hospitals Corporation et al., Defendants, and Ibex Construction, LLC, et al., Appellants. (And Another Action and Third-Party Actions.)

Second Department, November 18, 2015

APPEARANCES OF COUNSEL

*Andrea G. Sawyers* and *Shaub, Ahmuty, Citrin & Spratt, LLP*, Lake Success (*Timothy R. Capowski* and *Deirdre E. Tracey*, of counsel), for appellant Ibex Construction, LLC.

*London Fischer, LLP*, New York City (*Richard L. Mendelsohn* of counsel), for appellant Amsterdam & 76th Associates, LLC.

*Constantinidis & Associates, P.C.* and *Lynn, Gartner, Dunne & Covello, LLP*, Mineola (*Joseph Covello* and *Kenneth L. Gartner*, of counsel), for respondent.

**OPINION OF THE COURT**

ROMAN, J.

Prior to the trial on the issue of damages in this personal

injury action, the plaintiff's trial attorney surreptitiously videotaped an independent medical examination (hereinafter IME) conducted by an orthopedist retained by the defendant Ibex Construction, LLC (hereinafter Ibex). The attorney failed to disclose the existence of that recording to defense counsel, and then revealed its existence for the first time at trial, during redirect examination of his own paralegal, who took the witness stand to testify as to the brevity of the orthopedist's examination of the plaintiff. This resulted in the declaration of a mistrial, and the orthopedist subsequently declared that he was not willing to testify at the new trial. Since Ibex and the defendant Amsterdam & 76th Associates, LLC (hereinafter Amsterdam, and together the appellants), would be required to serve a subpoena upon the orthopedist to secure his testimony at the new trial, they separately moved, inter alia, for leave to have the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130-1.1. Justice Duane A. Hart of the Supreme Court, Queens County, denied those branches of the appellants' separate motions.

These appeals require us to determine whether a plaintiff's attorney must obtain approval from the court before making a video recording of an IME of the plaintiff, and whether CPLR 3101 requires that such a recording be disclosed to opposing counsel before trial. We answer both questions in the affirmative. We further conclude that the declaration of a mistrial in this case was attributable to the conduct of the plaintiff's trial attorney. Moreover, we find that the orthopedist was unwilling to testify voluntarily at the new trial because of that conduct and because the Supreme Court repeatedly, without any basis in fact, accused the orthopedist of lying during his cross-examination. The court also repeatedly threatened to recommend that the District Attorney's office prosecute the orthopedist for perjury. Accordingly, those branches of the appellants' separate motions which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130-1.1 should have been granted, and we remit the matter to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith.

Background

The plaintiff, Manuel Bermejo, commenced the underlying action to recover damages for personal injuries sustained by him when he fell from a scaffold at a construction site located

at premises owned by Amsterdam. Ibex was the general contractor for the construction project. The plaintiff was awarded summary judgment against the appellants on the issue of liability on the cause of action alleging a violation of Labor Law § 240.

Prior to the trial on the issue of damages, Ibex retained an orthopedic physician, Michael J. Katz, who conducted an IME of the plaintiff in May 2011. The plaintiff was accompanied at the IME by his trial attorney, Patrick J. Hackett, who was of counsel to Constantinidis & Associates, the law firm representing the plaintiff, as well as Yury Ramirez, a paralegal employed by Constantinidis & Associates, who served as a Spanish language interpreter for the plaintiff. In the report he prepared after conducting the IME, Dr. Katz noted that "[t]he evaluation took place between the hours of 6:00 p.m. and 6:45 p.m." Dr. Katz interviewed the plaintiff, took various measurements, examined his lumbosacral spine and his right foot and ankle, and reviewed approximately 30 medical reports relating to the plaintiff generated by various physicians since the time of his accident. Dr. Katz's report stated that Mr. Hackett "had a series of nasty outbursts regarding the history of this injury." The report asserted that Mr. Hackett refused to allow the plaintiff to answer any questions relating to the happening of the accident, the medical treatment he received afterward, or his present complaints, and instead advised Dr. Katz, among other things, that he should get the information from defense counsel. The report also contained the following comments:

> "Mr. Hackett presented quite a nasty and obstructive front toward getting a proper history. . . . Mr. Hackett just became nastier as questions were asked. . . . It is highly unusual for an individual's attorney to behave as Mr. Hackett did in order to mislead the examiner and try to get them [sic] to believe that these changes were acute and not chronic."

In March 2013, after surgery on the plaintiff's shoulder, Dr. Katz performed a second IME, which focused on the plaintiff's shoulder. Once again, Mr. Hackett and Ms. Ramirez were with the plaintiff in the examining room.

In April 2013, the damages trial commenced in the Supreme Court. The plaintiff was represented at the trial by Mr. Hackett and Gus J. Constantinidis, and Ms. Ramirez was also present in the courtroom. Ibex was represented by Michael T. Reilly,

and Amsterdam was represented by Richard L. Mendelsohn. Dr. Katz testified regarding the IMEs he performed and the findings he made. During his direct examination by Mr. Reilly, the proceedings were interrupted. Although the transcript of that portion of the proceedings does not reflect exactly what occurred, it appears, based on subsequent colloquy, that Ms. Ramirez had a visible reaction to certain testimony given by Dr. Katz. What the transcript does reflect is the following exchange:[1]

> "Q: We're talking about the first examination, Doctor. How long did that first examination of Mr. Bermejo take in May of 2011?
>
> "A: 45 minutes.
>
> "Q: Could you describe the examination that was done?
>
> "A: First a history done.
>
> "THE COURT: Excuse me. Send the jury out.
>
> "(Whereupon the jury exited the courtroom and the following occurred)
>
> "THE COURT: Doctor, step out.
>
> "(Witness complies)
>
> "THE COURT: Everybody be seated. In the spirit of the witness' stay outside, I observed something. Mr. Hackett, Mr. Constantinidis, speak to your office person because she may be a potential witness. You could speak to her here, as long as you speak to her, because I have a feeling you are going to call her.
>
> "(Short pause)
>
> "THE COURT: Do you need me to explain what I just did?
>
> "MR. HACKETT: Yes, that would be—
>
> "THE COURT: It appears that, and because, you know, the jury is supposed to observe everything

---

1. Except as indicated by bracketed material, portions of the trial transcript are quoted herein as they were transcribed, and all grammatical errors are in the original.

that goes on in the courtroom. The young lady's name is Gina [Yury]? . . .

"THE COURT: Uri [sic]. She was the person who took Mr. Bermejo to see the doctor on at least one occasion?

"MR. HACKETT: Both.

"MR. CONSTANTINIDIS: Both occasions.

"THE COURT: She was—she might differ as to some of the testimony of the doctor, fair statement?

"MR. HACKETT: Yes, your Honor.

"THE COURT: That's why. I now, based upon what I observed, I have now—and you plan to call her, I would imagine?

"MR. HACKETT: I do believe I will be doing that, your Honor.

"THE COURT: Bring the jury back in. Get the doctor first.

"MR. REILLY: We have no notice of a witness like that, so I would just object at this point.

"THE COURT: Again—

"MR. HACKETT: It would be in the way of rebuttal, your Honor.

"THE COURT: Okay."[2]

The direct examination of Dr. Katz then resumed, and was completed. During the cross-examination of Dr. Katz by Mr. Hackett, the testimony that lies at the heart of the controversy presented on these appeals was given. Dr. Katz was questioned as follows:

"Q: Doctor, on that first exam I believe you said you took 45 minutes; is that correct?

"A: Right.

---

2. The Supreme Court subsequently recounted that "I only observed [Ramirez's] reaction to a certain answer the doctor gave. Based on that I assume—because this isn't my first day doing this, that she was going to have a discussion with Mr. Hackett and Mr. Constantinidis . . . and she could become a witness."

"Q: And on that second exam of the shoulder[,] how long did that take?

"A: That's uncertain.

"Q: Uncertain?

"A: I don't think I have a record. I don't think I have it recorded, no. I don't think it's recorded.

"Q: Or would you say it's more or less than 30 minutes?

"A: I don't really recall at this point.

"Q: Well, how long do you have a custom and practice when you're doing a shoulder exam as to how long you generally take?

"A: I don't really have, you know, an allocated time.

"Q: Well, would you believe in at least your experience that it would be more or less than 15 minutes?

"A: Quite frankly, I don't know.

"THE COURT: Excuse me, Doctor, I cannot accept an I don't know. You have been doing this for awhile. I will have to insist on what your custom and practice would be as to what type of, the length of an exam of this type.

"THE WITNESS: I think in the range of between ten and 20 minutes would be appropriate."

After Dr. Katz's testimony was concluded, Mr. Hackett called Ms. Ramirez as a witness. With regard to the first IME of the plaintiff, Ms. Ramirez was asked how much time transpired "from the time that Dr. Katz came into the room until Dr. Katz left the room," and she responded: "About ten minutes." According to Ms. Ramirez, several minutes were consumed by arguments between Mr. Hackett and Dr. Katz, and then the plaintiff "was examined. It was about three minutes or four minutes tops." When asked whether she recalled anything else about that IME, Ms. Ramirez testified: "I don't recall the details. I just know that he examined his foot. I'm not sure but I believe he examined his back. I'm not really sure. I can't tell you." With regard to the second IME, Ms. Ramirez testified as follows:

"Q: And how long did that exam take?

"A: The actual exam was three minutes. The total evaluation was like five.

"Q: And how do you know that it was three minutes?

"A: I pretty much timed it.

"Q: And how did you time it?

"A: With my phone."

On cross-examination, Ms. Ramirez admitted that, when she attended the first IME, she was not present when Dr. Katz was reading the plaintiff's medical records, so she did not know "how long he spent reviewing any records or anything like that." No questions regarding the duration of the second IME were asked of Ms. Ramirez on cross-examination.

When the cross-examination of Ms. Ramirez concluded, Mr. Hackett stated that he had "[j]ust one" question to ask on redirect examination. That questioning proceeded as follows:

"Q: [O]ther than using your phone to determine how much time Dr. Katz spent on the second exam[,] do you have any other information regarding how long that took?

"A: Yes.

"Q: And what is that?

"A: A video.

"Q: A video of the examination?

"A: Yes.

"MR. REILLY: Your Honor, objection."

At that point, the Supreme Court excused the jurors and sent them home for the weekend. The court asked Mr. Hackett when he had provided notice of the video to defense counsel, and Mr. Hackett responded: "We didn't because there's no need to do that, your Honor." Mr. Reilly moved for a mistrial, and Mr. Mendelsohn joined in that motion. The court directed Ms. Ramirez to return to the witness stand, and the following colloquy ensued:

"THE COURT: Okay and for the record you're saying that you took this video?

"THE WITNESS: I didn't.

"THE COURT: Who took the video?

"MR. HACKETT: I did, your Honor."

The Supreme Court advised Mr. Hackett that "there is a prohibition from you acting as a witness or becoming a witness that I tried to skirt and that's a problem and the person who can certify that video is you Mr. Hackett." Mr. Hackett responded that the video could "be certified by itself because it's going to be clear the parties who are in the video[,] it's going to be clear it's a video of Mr. Bermejo and . . . if it needs any other certification[,] to be done by Ms. Ramirez." Mr. Hackett further stated: "we frankly weren't intending to use it except when the doctor got on the stand and said that his examination [was] 20 minutes long when it clearly was not, then that became a situation."

The Supreme Court directed the attorneys to appear on the next business day to present arguments as to whether a mistrial should be declared. The court characterized the matter as "an issue of first impression," and remarked that

"[t]he specific packaging of this[,] well[,] publishing in this manner to the jury was surprising to say the least that while the witness who was a member of the plaintiff's law office blurted out in a planned manner that there was a tape of this. Notwithstanding there is a continuing order signed by both parties in our preliminary [conference] order. . . . There is a requirement not of the discovery but of disclosure that if you got a recording you've got to give it up[,] not when you're asked for it[,] without being asked for it."

When Mr. Hackett argued that disclosure of the video recording was not required in this case because "there was not a determination as to whether or not we were going to use it," the Supreme Court responded: "That's not your call. . . . [T]hat's my call. . . . If you got the tape it's—that's why we distinguish between disclosure and discovery. They don't know you have it so they don't know to ask for it."

The parties submitted memoranda of law addressing the appellants' motion for a mistrial. In support of their motion, the

appellants argued that a mistrial was necessitated by Mr. Hackett's misconduct in surreptitiously making a video recording of the second IME. Specifically, the appellants contended that Mr. Hackett failed to provide defense counsel with notice of the recording of the IME pursuant to CPLR 3121, failed to seek leave of the trial court to record the IME, failed to disclose a recording involving a party as was required under both CPLR 3101 (i) and the preliminary conference order, engaged in "an impermissible back-door attempt to introduce an otherwise impermissible day-in-the-life video," converted himself into a potential witness in violation of rule 3.7 of the Rules of Professional Conduct (22 NYCRR 1200.0), violated rule 8.4 (c) of the Rules of Professional Conduct (22 NYCRR 1200.0) prohibiting attorney conduct involving "dishonesty, deceit, fraud or misrepresentation," and caused unfair prejudice to the appellants by purposefully eliciting the existence of the inadmissible video recording, which could not be remedied by any curative instruction. In opposition to the appellants' motion, Mr. Hackett argued that there was no obligation to disclose the video recording because it was a recording of a nonparty, Dr. Katz. Mr. Hackett also argued there was no obligation to disclose the recording because he had no intention of using it until Dr. Katz "lied on the stand about the amount of time the physical examination took." Mr. Hackett further argued that the recording constituted work product, and was not introduced as evidence in chief. Mr. Hackett explained that he was motivated to record the second IME after Dr. Katz's first IME report was issued, which contained various untrue accusations that Mr. Hackett had engaged in obstructionist behavior during the examination.

When the parties appeared before the Supreme Court to present arguments on the mistrial motion, the court made the following statement:

> "Under Section 3101 . . . . the tape should have been turned over. . . . All tapes are supposed to be turned over. The question is, who caused the problem? Is it the plaintiff for not turning over the tape? Is it the defendants for hiring this doctor in the first place who evidently, if the tape are to be believed[,] and I don't know if they're to be believed[,] conducting an examination that didn't last the length of what he said it was supposed to last, it was shorter than it was and that might put into

question the first examination that he said lasted 45 minutes? Or was it the doctor who, if you are to believe the tape conducting an examination that was short of what the tape indicates? Who caused the mistrial? Was it one or two or three? My belief is all three parties caused the mistrial. All three caused the mistrial."

The Supreme Court then encouraged the parties to avoid the need for a new trial by settling the case. Addressing itself first to the appellants' attorneys, the court stated that

"all discovery is over[,] you are now stuck with this doctor even in a retrial. You are stuck with this doctor. You, the plaintiffs, are stuck in a retrial with the cost of bringing the case. The other parties have associated issues of time and costs that now cause a problem. So the question is, do you want to settle it? I would suggest, and that's why everybody's here and even if the doctor wants to contribute because clearly, and I believe I left a message with you that the doctor should come by with his own attorney. . . . I'm not letting the doctor take the stand again unless he has counsel. The doctor's career doing IMEs might be over. If he gets caught in a lie on something that's material at trial his future use to anyone is useless, correct? That will follow the doctor forever. . . . So, this is truly a pox on everybody's house because . . . unless you can figure out a way to settle it I will declare the mistrial and post mistrial I will have a sanctions hearing and I will, Doctor, be turning the record over to the district attorney. So, you got a choice. You can collectively get yourselves out of this problem or I will do what I will do."

The Supreme Court then called a recess, and when the parties returned to the courtroom, the court advised Dr. Katz as follows:

"I suggest you not say anything until you are dealing with an attorney. . . . I would strongly suggest you not do anything because you're in more trouble than you think. It's probably that your career doing IMEs is over. It's possible, unless this case is settled, that I might be taking more—the attorneys have a duty basically not to do anything with

regards to the district attorney. If I find out or if I even suspect something is going on I have a duty to get in touch with the district attorney[,] and getting in touch with the district attorney is not a good thing for you in this case. Is that understood?"

After another recess, Mr. Reilly asked the court to reconsider allowing the appellants to have another IME performed by a different orthopedist, in light of the "exceptional circumstance" presented in this case, but the court declined to do so. After the court ascertained that David Vozza, an attorney representing Dr. Katz, was now present in the courtroom, the following exchange occurred:

"THE COURT: Counsel, is it likely that based upon the little you know about[,] you would let your client continue to offer testimony in this trial?

"MR. VOZZA: Absolutely not, Judge. . . .

"THE COURT: But I could declare a mistrial and if the mistrial—like I said, you still have this doctor who will now not testify. The plaintiff—I'm not going to say the plaintiff didn't do anything wrong because the plaintiff shouldn't have taped the IME firstly and then if they taped the IME they should have told the defendant that they [taped] the IME and the doctor shouldn't [have] lied about the length of the IME to cause the plaintiff to come up with the tape of the IME."

Mr. Reilly and Mr. Mendelsohn both made additional arguments as to why the appellants should be permitted to have a new IME conducted by a different doctor. They also made an application to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff, on the ground that Mr. Hackett, as the person who had made the recording, was now a potential witness. Thereafter, the Supreme Court, addressing itself first to Mr. Vozza, stated:

"I think it would be prudent again, Counsel, if for you to explore Dr. Katz participation in future court matters whether they be workers comp, whether they be in this building or any other building where somebody has to take an oath. . . . I'm going to second call this while you figure out how you can settle this case so I can seal this record so that I don't have to send things over to the district at-

torney, so that I don't have to remove counsel from this case, so that the defendant isn't put in a position where they have to go forward on the RSD case with no orthopedist and so the disclaiming carrier for the third-party defendant isn't caught holding a three to six million dollar bag. . . . They can all happen in this case. Parties can be sanctioned, people can go to jail. Am I making it up? No."

The matter was adjourned to the following day, and when Mr. Vozza asked whether Dr. Katz's appearance would be necessary, the Supreme Court responded:

"I would think you and the doctor would be the first ones to open up this building in the morning . . . [b]ecause, again, I am not making the determination at this point if he is lying or not[,] but if someone determines that the doctor was lying or if I think that there is a hint that he was lying[,] I'm going to be the least of his problems. My friends in my former office in the district attorney[,] they might have a conversation with you, Counsel, his malpractice carrier will have a conversation, the State Department of Health would have a conversation with him, the other the defendants would have a conversation with him[,] and I don't think any of these conversations are going to be beneficial to him."

After settlement negotiations proved unsuccessful, the Supreme Court granted the motion for a mistrial and advised the jury that it was declaring a mistrial. After excusing the jury, the court announced: "I'm also scheduling a sanctions hearing against plaintiff's law firm or plaintiff's counsel, the defendants and the carriers for hiring Dr. Katz[,] and Dr. Katz." The court noted that it would "vacate the sanctions and the trial date" if the case were settled that day. The case was not settled that day.

The appellants subsequently filed separate written motions seeking (1) a re-examination of the plaintiff by an orthopedist designated by the appellants, (2) to direct plaintiff's counsel to pay the costs incurred by the appellants for the first trial, (3) to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff, and (4) to quash certain subpoenas duces tecum served by the plaintiff after the mistrial was declared upon Dr. Katz and another physician retained by the appellants.

In support of their motions, the appellants argued, among other things, that, due to the misconduct of plaintiff's counsel, Dr. Katz now refused to testify voluntarily at a retrial, thereby making him a hostile witness to the defense and requiring the appellants to serve him with a subpoena in order to obtain his testimony. In a supporting affirmation, an attorney for Ibex averred that he had been advised by Dr. Katz and Mr. Vozza that Dr. Katz "would not voluntarily testify before Your Honor" at a retrial. The appellants further argued that, since the mistrial was necessitated by the misconduct of plaintiff's attorneys, those attorneys should be required to pay the costs incurred by the appellants in the first trial, and that, since Mr. Hackett had made himself a potential witness in the case by making the video recording, he and the law firm should be disqualified as counsel for the plaintiff under the advocate-witness rule.

In opposition to the appellants' motion, the plaintiff argued, among other things, that "the issues before the court arose as a result of the perjury by Dr. Katz on the witness stand." The plaintiff reasoned that "[i]t is Dr. Katz'[s] behavior, specifically lying to this court and jury[,] that necessitated the questioning pertaining to the digital recording at trial." In an affirmation submitted in opposition to the appellants' motions, Mr. Hackett asserted that "I had never used [my] iPhone to record a physical examination in the past. However, I think that in the future, it would be an appropriate tool to see if an examining doctor is truthful." Mr. Hackett further averred that

> "[d]uring the break before [Ms. Ramirez] testified, Gus Constantinidis and myself called four different prominent trial attorneys to discuss the situation. Each one of them advised us that we did not need to exchange the digital recording and that it was absolutely appropriate to use the digital recording as rebuttal evidence. Two of the attorneys actually stated that I had a duty to use the digital recording to expose Dr. Katz as a liar and to do otherwise would have been an abrogation of my duties as an officer of the court."

The Supreme Court conducted a hearing on the appellants' motions on multiple dates in June and July 2013. At the outset of the hearing, the court asserted that "[d]uring the trial . . . it was determined that the expert witness, one Dr. Katz, lied about a material fact, i.e., the length of his second IME, which

was recorded by plaintiff's counsel Mr. Hackett, not disclosed, but it basically required that I declare a mistrial." When Mr. Mendelsohn argued that the events that led to the mistrial were set in motion by Mr. Hackett's improper recording of the second IME, the court responded: "And what is the bigger problem? Mr. Hackett's recording or your witness lying his whatever off?" The court later remarked that "nothing beats a witness getting caught red-handed in an out-and-out lie. Always always everybody's favorite." At that point, the following exchange took place between the court and Sean P. Lenihan, of Mr. Vozza's office, who was appearing for Dr. Katz:

"MR. LENIHAN: Your Honor, if I may, the characterization of Dr. Katz's testimony as an outright lie I think is unfair.

"THE COURT: I'm sorry, when did you learn how to tell time?

"MR. LENIHAN: Your Honor, I reviewed the—

"THE COURT: When did you learn that a minute fifty-six is nowhere near ten minutes?

"MR. LENIHAN: Well, with respect to the—I reviewed the videos before I came today.

"THE COURT: Yeah, how long is it?

"MR. LENIHAN: It lasted five minutes. So I don't know where the minute fifty-six came, and he testified—

"THE COURT: Okay, so let's go with five minutes. Where does five minutes come close to twenty minutes?

"MR. LENIHAN: He testified—after he originally testified, your Honor, he did not know, he did not remember, your Honor was not satisfied with that and wouldn't let that go. You pressed him to give an answer.

"THE COURT: Because he—Counsel, because he was specific as to what he did.

"MR. LENIHAN: That's true.

"THE COURT: And he gave a laundry list of tests that he did that would have taken more than two

minutes, it would have taken more than five minutes, and that the paralegal said didn't happen; is that correct?

"MR. HACKETT: (Indicating.)

"MR. LENIHAN: All I'm saying, your Honor, is that he testified—

"THE COURT: Excuse me. Did he perform those tests in whatever time he did that he testified to? No.

"MR. LENIHAN: Was the doctor asked that on the record?

"THE COURT: Yes. No. . . .

"MR. LENIHAN: He estimated ten to fifteen minutes; it was actually five.

"THE COURT: Then let me replace the lie with the length of his examination with what he did in his examination. Oh, that gets him off the list.

"MR. LENIHAN: With respect to your characterization of it as a lie, I think it's unfair. When he originally when asked said I don't remember, so now you're forcing him to create an answer that he doesn't have a memory of. He had no memory of it.

"THE COURT: Counsel, he's a witness. He's specific as to what tests he performed.

"MR. LENIHAN: If anything, you forced him to perjure himself, if you're going to characterize it.

"THE COURT: By asking him what happened? . . .

"MR. LENIHAN: When asked the question, your Honor, he said he didn't remember. You weren't satisfied with that. You said he had to give an answer.

"THE COURT: Because he is a witness at trial. So by asking him what happened, that's forcing him to perjure himself?

"MR. LENIHAN: If what he is saying is not from his own memory, yes.

"THE COURT: Now I've heard everything. I thought I heard everything. But asking the witness what happened and him lying, that's forcing him to perjure himself.

"MR. LENIHAN: He told what he thought the time frame was. He told you I have no recollection of that."

During a discussion of whether Dr. Katz would be testifying at the retrial, the Supreme Court commented that "Dr. Katz might not come in, because if Dr. Katz comes in somebody might call the district attorney and say indict this guy for perjury. Why would I do that? Oh, because he's not telling the truth." Later, the court advised Mr. Mendelsohn that "[i]f Dr. Katz wants to come in at the risk of his future freedom, you're stuck with him."

At the next court appearance, the Supreme Court opened the proceedings with the following remarks:

"I cannot sanction Dr. Katz. He is not a party. I can sanction the attorneys that called him up to $10,000.00, which is my plan because you called him. Based on what the conduct that he displayed in doing this not IME, somebody should have known. The interesting thing is if I sanction the attorneys that called him, they will appeal it. There will be a public record. Dr. Katz' future doing IMEs because he lied in this one will probably be finished. I can and it is a shame Dr. Katz's attorney is not here. I can hold him in civil contempt for [causing] the state to expend thousands of dollars on a trial and then coming in here to lie about what he did, causing a mistrial. . . . On the other hand, again I am not happy with the non-notice of recording. I can sanction the plaintiff, but it would only be a nominal sanction. . . . [T]he worst thing is that we have a doctor who clearly lied about the length of time he took to do an IME, clearly. No matter how you slice it, 10, 15, 20 minutes. It turns out he took 1 minute and 56 seconds. He testified as to findings that he obviously could not have had in a minute and 56 seconds. . . . We are wasting our time trying cases over and over and over again because a doctor who is making millions of dollars doing IMEs decides that he is going to lie. I would hope frankly

that the Law Journal and everybody else that covers the news sees this. . . . Dr. Katz lied. I am finding that he lied. He clearly, his clear unequivocal testimony that his IME took 10, 20 minutes. . . . Now, he gets caught lying. There is no other way to put it. He lied. There is no other way to make it nice. He said the IME took between 10 to 20 minutes. It took a minute and 56 seconds. . . . Mr. Mendelsohn, I am sanctioning your law firm $10,000.00. . . . [T]here is no doubt about the finding that Dr. Katz lied. I want you to appeal that finding so that every lawyer in the state that looks at the Law Journal and looks at the record will be able to see what went on during this trial."

Mr. Reilly and Mr. Mendelsohn argued that they and their law firms and their clients did not suborn perjury, had no way of knowing that Dr. Katz would give any untruthful testimony, and should not be held responsible for any untruthful testimony he may have given. The Supreme Court inquired as to how frequently the attorneys' firms and the insurance carriers with which they worked had retained Dr. Katz. The attorneys responded that although they had retained Dr. Katz from time to time in the past, they had no reason to believe that he would give untruthful testimony. The court remarked that there had been "one lie here, a huge lie." The court then made the following comments:

"THE COURT: I am less interested in the money. I will eventually order your firm and Mr. Mendelsohn's firm to pay. It is the scarlet letter that I am interested in. This gentleman is still doing IMEs. He is still being used by defense firms. . . . I can't imagine the amount of extra trials and extra litigation and extra costs and extra everything that is occasioned by having this gentleman part of the system. . . . I can't sanction him, but I can hold him in civil contempt after a hearing. Your firm because you called him and you are responsible for him and you relied on him. That I could sanction. . . . I want you to appeal me. I want you to appeal the finding that two of the carriers caused this gentleman to testify and he lied. And he lied. And he lied badly."

Mr. Reilly argued that, contrary to the position being taken by the Supreme Court, the mere fact that the appellants called

Dr. Katz as a witness did not make them responsible for what the court characterized as Dr. Katz's lies. Mr. Reilly further argued that it was not the purported lies, but the conduct of Mr. Hackett, that caused the mistrial. The court remarked that the only person it was unhappy with was Dr. Katz, and that it "would like to put Dr. Katz out of the business of doing IMEs period." The court then stated: "I will sanction [Mr. Reilly's law firm] $10,000.00, and [Mr. Mendelsohn's law firm] $10,000.00."

The Supreme Court thereafter addressed the sanction to be imposed upon Mr. Hackett. The court heard argument from Kevin P. Connolly, of counsel to Constantinidis & Associates, who had previously had the following exchange with the court on the issue of Mr. Hackett's conduct:

> "THE COURT: How long have you been an attorney?
>
> "MR. CONNOLLY: A few years, your Honor.
>
> "THE COURT: And how many times have you filmed the IME?
>
> "MR. CONNOLLY: A few times.
>
> "THE COURT: And how many times have you filmed the IME without telling anybody?
>
> MR. CONNOLLY: All the time.
>
> "THE COURT: And how many times have you tried to use it in court?
>
> "MR. CONNOLLY: Never."

Mr. Connolly argued that it was necessary for Mr. Hackett to make the video recording "in order to protect his reputation" from being assailed by Dr. Katz, a "known purveyor of falsehood," and that to prevent the recording from being brought out at trial, "[a]ll Dr. Katz has to do is tell the truth." The Supreme Court noted that "I know the sanction for Mr. Hackett is going to be significantly less than that for the defendants because I believe Mr. Hackett acted, I don't want to say in good faith, but in our system there is just nothing worse than lying." The court then heard argument from Mr. Hackett, who argued that he believed that his actions were permissible under the CPLR, and that the case law that he had presented to the court indicated that his conduct was appropriate. In response, the court stated:

"Give me a case that says what you did was appropriate. Taping an IME, sitting on the tape until you can cross-examine the witness, getting the witness to lie which I have to, I have to again parrot that Dr. Katz'[s] attorney said probably the stupidest thing that I have ever heard in court, I caused him to perjure himself by forcing him to tell the truth. That is quite possibly the dumbest thing I have ever heard."

Mr. Hackett made further arguments, including the observation that a sanction against him may need to be reported to the Appellate Division and bar associations, and may affect his legal malpractice insurance. After hearing from Mr. Hackett, the Supreme Court stated: "I am sanctioning your firm $250. I want you to appeal."

Mr. Mendelsohn then argued that "the reporting requirements, the marks against Mr. Hackett, those are marks that go against Mr. Reilly and myself as well. We didn't even do these acts and we are having the mark against us." Mr. Mendelsohn emphasized that the stigma associated with the sanction against him would follow him for the rest of his career. The Supreme Court then stated: "You can stop. You are right." The court asked the attorneys what alternative course of action they would propose, and Mr. Mendelsohn suggested that it should be sufficient that the court had unsealed the record and that Dr. Katz, therefore, "will not be able to testify ever again in Court." The following colloquy then occurred:

> "THE COURT: I tell you what. Will you agree that Dr. Katz lied on the record, yes or no?
>
> "MR. MENDELSOHN: I can't say that he lied on the record. From what he said, he agreed it would take 10, 20 minutes. The tape says otherwise. I wasn't there. From the facts that are before the Court—
>
> "THE COURT: Step up. Off the record.
>
> "(Whereupon, an off the record discussion was held at this time and the following ensued:)
>
> "THE COURT: Mr. Mendelsohn, do you have any objection to my finding that Dr. Katz lied on the record?
>
> "MR. MENDELSOHN: If that is the Court's deter-

mination, I have no objection based upon the facts before the Court.

"THE COURT: Mr. Reilly, do you have any objection to my findings that Dr. Katz lied on the record?

"MR. REILLY: I don't have that standing, your Honor.

"THE COURT: You are a person in this trial. Do you object? If you don't object for whatever reason, do you object yes or no?

"MR. REILLY: I can't say I am in a position that I object, you Honor. Your Honor is characterizing it. That is you Honor's finding. . . . I cannot be in a position where I am there to argue. I don't represent Dr. Katz.

"THE COURT: Even if you don't have the standing?

"MR. REILLY: If that is your Honor's determination, that is your Honor's determination. End of story, your Honor. Whatever happens, happens. I cannot say anything further on that. I don't know that the consequences would be or anything else. I don't represent the man, but your Honor made a finding."

The Supreme Court then decided to vacate the $10,000 sanction it had imposed upon each of the appellants' attorneys for calling Dr. Katz as a witness, as well as the $250 sanction it had imposed upon plaintiff's counsel for failing to disclose the video recording of the IME. However, the court noted that it was "still not finished with Dr. Katz," and suggested that counsel's insurance carriers "reinforce their efforts to never use him again." Later that day, Dr. Katz appeared before the Supreme Court with his attorney, Mr. Vozza, and the court had the following discussion with Mr. Vozza:

"THE COURT: Counsel, so that you know, I made a determination with Dr. Katz. The plaintiff's attorneys agreed that Dr. Katz lied. At least one of the defense attorneys agreed that Dr. Katz lied. It is not my guess that Dr. Katz lied. There is a difference between 1 minute 56 which was the recorded

time of the IME that Dr. Katz performed and the 10, 20 minutes that Dr. Katz testified to.

"MR. VOZZA: I . . . want to note my continuing objection, characterization.

"THE COURT: How do you confuse a minute 56 with ten minutes? . . .

"MR. VOZZA: Just to make one point, your Honor. The 10, 20 minute time range was not specifically for a specific—

"THE COURT: No. You see this is the part that you are missing. I am not making a big thing of 10, 20 minutes. Witnesses confuse time all the time but he didn't do the tests that he said he did in the minute 56 seconds. That is the problem. . . . He didn't do the tests that he said he did. How do you screw that one up? You either do the test or you don't do the test.

"MR. VOZZA: Your Honor is assuming that the examination lasted 1 minute and 56 seconds.

"THE COURT: I am talking about what is on the film.

"MR. VOZZA: The film is different. It doesn't take into account the different things that Dr. Katz needs to perform in performing IMEs other than having actual physical contact with the plaintiff. There are records to review and conversations that he must have had with Dr. Katz. What we are doing is dissecting to the actual time that he is actually touching the patient. If that time is 1 minute 56 seconds and I have not seen it since counsel supplied it to me. That appears to be the physical exam. It ends and starts abruptly. There are portions that we don't know what actually occurred in the examination. . . .

"THE COURT: . . . [Y]ou might confuse two minutes with ten minutes in a manner of speech but how do you confuse two minutes with 20 minutes?

"MR. VOZZA: I don't think there was confusion, Judge.

"THE COURT: I don't think there was confusion either. I think he lied.

"MR. VOZZA: I would like to note my objection.

"THE COURT: You have an objection. Again, I will refer this, unless I don't think Dr. Katz, you know, we have enough problems doing trials. It is a strain on the system, but unless I get some sort of representation from you on behalf of Dr. Katz that he is out of the medical/legal business, I am going to refer this to the Administrative Judge and the District Attorney of Queens County so that they can do whatever they want to do. Perjury is a D felony.

"MR. VOZZA: Can I talk to Dr. Katz?

"THE COURT: I would strongly suggest that you talk to Dr. Katz. As it is, and I can say this because it has already been said on the record. He will not be doing business with Travelers or AIG anymore. I have a feeling that any attorney or adjustor within earshot or who read this transcript will not be dealing with Dr. Katz much anymore. It might be an easy way for him to bow out gracefully from harm's way. I would imagine that his number is not going to be called too much in the foreseeable future. It might be a nice way out. Second call.

"(Whereupon, a recess was taken and the following ensued:)

"THE COURT: Let the record reflect that I gave Dr. Katz the option of and I would institute a special proceeding to retire from the medical/legal business. Retire at the time and he has declined. What I am now going to do, I am going to order a full transcript of everything, the trial and the subsequent proceedings. I will present that to both the administrative judge of Queens County and the District Attorney. I would recommend to the District Attorney that they explore prosecuting Dr. Katz for perjury. Again counsel, it is not the time so much if the doctor thinks that he can explain the time. It is not the time problem. It is that there are tests that he testified to that he didn't do. That is the per-

jury. . . . Again, I am making it very clear on this record, the insurance companies here are not going to go near him. I unsealed the record. Everybody from now on when he testifies as to the tests that he performed, it is always going to be questioned from now on. . . .

"MR. VOZZA: I would ask for an opportunity to consult with our criminal department in our firm.

"THE COURT: Sir, you have five minutes to do whatever you are going to do. This part of the matter has been going on a month. In the meantime is Dr. Katz still doing IMEs?

"DR. KATZ: Yes.

"THE COURT: That is the problem. He is still doing IMEs. . . . It is like a wound that is festering. Every time he does another IME. When is it going to stop? He is making 7 figures a year doing IMEs. Then he comes to my part and lies. . . . Does your client really think if the insurance industry or some of the insurance companies that hired him before when they find out that he lied, do you really think they are going near him? As they distribute the transcript, certainly this morning's transcript, certainly the last transcript, certainly the transcript where his own attorney admitted that he perjured himself, but he only perjured himself because I told him to tell the truth . . . Counsel, you have five minutes to talk to your client."

At the next court appearance, the Supreme Court opened the proceedings with the following statement:

"Firstly, I made a prior ruling that is agreed to by at least one defendant that Dr. Katz lied on the stand. . . . [The appellants] have asked for a new IME because of the fact that the expert that they had retained was found to have lied on the stand. That application is denied. You retained him. You are stuck with him."

When Mr. Reilly argued that Dr. Katz, in light of his refusal to testify voluntarily at the retrial, was now an adverse witness to his client, the following exchange occurred:

"THE COURT: All he has to do is tell the truth.

"MR. REILLY: Well, your Honor doesn't want him in here.

"THE COURT: No. I don't want him to testify in the future in any other trials. I am stuck with him. . . . If he comes and tells the truth, which means he would say instead of the exam taking 10, 20 minutes, it took 1 minute and 56 seconds. His finding might have been shall we say exaggerated. The amount of the tests that he did might have been somewhat exaggerated. Of course, he might be cross-examined."

The Supreme Court subsequently stated that it was sending a copy of Dr. Katz's testimony in this case to an assistant district attorney, and then remarked: "The man is basically out of the business of testifying. . . . $500,000 to a million dollar income that he got doing IMEs and the like, that is over. As soon as the State finds out about it, he is not going to do any Worker's Comp exam." The court then engaged in the following colloquy with Mr. Vozza:

"MR. VOZZA: Yes. I just want to reiterate my client's general objection to your Honor's assessment that he perjured himself.

"THE COURT: What did I miss? . . .

"MR. VOZZA: Your Honor, I have an ethical obligation to my client. I have been authorized by the Court [sic] that he objects to your Honor's characterization of his testimony.

"THE COURT: Then let him come in and tell me himself.

"MR. VOZZA: Well your Honor, like I said if he is subpoenaed, he will be here.

"THE COURT: Maybe I will have the contempt hearing here. He is denying that he lied. He should be happy to get away with me just saying that he lied. Let it go at that. Yes, we will have a finding forever more that a Justice of the Supreme Court of the State of New York said that he lied because he did it. I would suggest that you let it go at that."

The Supreme Court determined the appellants' motions in an order, an amended order, and a second amended order. In

the second amended order, dated July 26, 2013, the court granted those branches of the motions which were to quash the subpoenas duces tecum served on the physicians retained by the appellants, but denied those branches of the motions which were for a re-examination of the plaintiff by an orthopedist designated by the appellants, an award of costs against plaintiff's counsel, and disqualification of plaintiff's counsel. These appeals ensued.

Discussion

1. The Request for a New IME

Pursuant to CPLR 3121 (a), if a plaintiff's physical condition is in controversy, the defendant may require the plaintiff to submit to a physical examination (*see Orsos v Hudson Tr. Corp.*, 95 AD3d 526, 526 [2012]; *Torelli v Torelli*, 50 AD3d 1125, 1125 [2008]; *Anonymous v Anonymous*, 5 AD3d 516, 517 [2004]). There is no restriction in CPLR 3121 limiting the number of examinations to which a party may be subjected, and a subsequent examination is permissible provided the party seeking the examination demonstrates the necessity for it (*see Rinaldi v Evenflo Co., Inc.*, 62 AD3d 856, 856 [2009]; *Huggins v New York City Tr. Auth.*, 225 AD2d 732, 733 [1996]; *Young v Kalow*, 214 AD2d 559, 559 [1995]). Furthermore, after a note of issue has been filed, as in this case, a defendant must demonstrate that unusual and unanticipated circumstances developed subsequent to the filing of the note of issue to justify an additional examination (*see* 22 NYCRR 202.21; *Giordano v Wei Xian Zhen*, 103 AD3d 774, 775 [2013]; *Schissler v Brookdale Hosp. Ctr.*, 289 AD2d 469, 470 [2001]).

In the present case, unusual and unanticipated circumstances warranting a new IME abound. Foremost among them is Dr. Katz's unavailability to the appellants as a witness at a retrial, due to his refusal to appear voluntarily, which, in turn, resulted from the Supreme Court's repeated accusation that Dr. Katz "lied" or committed "perjury" at the first damages trial. These extraordinary circumstances were set in motion when the plaintiff's attorney chose to surreptitiously videotape Dr. Katz's second IME of the plaintiff, and chose to withhold that recording from defense counsel despite the requirements of CPLR 3101 (i). Thus, at the outset, we address whether that conduct was appropriate or justifiable.

As appellate courts in other departments have recognized, there is no express statutory authority for the videotaping of medical examinations, either in the discovery statute authoriz-

ing physical examinations of parties (CPLR 3121) or in the court rule governing such examinations (22 NYCRR 202.17) (*see Flores v Vescera*, 105 AD3d 1340 [2013]; *Lamendola v Slocum*, 148 AD2d 781 [1989]). Indeed, the Appellate Division, Third Department, has commented that "authorization of videotaping was intentionally left out of [22 NYCRR 202.17] and such intent should be accorded deference" (*Lamendola v Slocum*, 148 AD2d at 781). Requests for permission to videotape IMEs have been made on a case-by-case basis, and "videotaping has not been allowed in the absence of 'special and unusual circumstances' " (*Flores v Vescera*, 105 AD3d at 1340, quoting *Lamendola v Slocum*, 148 AD2d at 781).

In *Lamendola v Slocum*, for example, the Supreme Court denied the plaintiffs' motion for a protective order permitting them to videotape the physical examination of the injured plaintiff, and granted the defendants' cross motion for an order compelling the injured plaintiff to submit to the examination without her attorney being present. The Third Department concluded that the Supreme Court should not have granted the defendants' cross motion, since, as our Court and others have held, a plaintiff is generally entitled to have his or her attorney present at a physical examination (*see Ponce v Health Ins. Plan of Greater N.Y.*, 100 AD2d 963, 964 [1984]; *Jakubowski v Lengen*, 86 AD2d 398, 401 [1982]). The *Lamendola* court noted that, although counsel should be permitted to be present at the examination, "the attorney's function is 'limited to the protection of the legal interests of his client' and in regard to the 'actual physical examination . . . he has no role' " (*Lamendola v Slocum*, 148 AD2d at 782, quoting *Jakubowski v Lengen*, 86 AD2d at 401).

With respect to the plaintiff's request for permission to videotape the examination, however, the Third Department determined that the Supreme Court had providently exercised its discretion in denying the motion. The Third Department found a decision relied upon by the plaintiff, *Mosel v Brookhaven Mem. Hosp.* (134 Misc 2d 73 [Sup Ct, Suffolk County 1986]), to be distinguishable. In *Mosel*, counsel for the plaintiffs sought the Supreme Court's permission to videotape the physical examination of the incompetent injured plaintiff, who had been in a semicomatose state for five years. In its decision on the plaintiffs' motion, the Supreme Court explained that "[n]ormally, this court would not be inclined to permit the videotaping of a physical examination of a plaintiff in a medi-

cal malpractice action. The facts herein, however, are unusual and not typical of other negligence or medical malpractice actions" (134 Misc 2d at 75). The court noted that the injured plaintiff "appears to be unaware of his environment and unresponsive to the actions of individuals in his presence" (*id.*). The court reasoned that

> "[t]he ordinary plaintiff is usually aware of the presence of the physician and his surroundings when he is being examined and would therefore be capable of describing the examination to his attorney, reviewing it with him and, thereafter, if necessary, testifying at trial regarding the events of the examination. Because of his infirmity, [the injured plaintiff] surely will be unable to communicate to anyone his feelings and reactions to the examination. . . .

> "Generally, the plaintiff's interests can be protected simply by having his attorney present. However, in the case at bar, this alone may not be sufficient to protect the interests of the plaintiff. If only the attorney for the plaintiff were present at the examination and a controversy arose concerning the manner in which the examination had been conducted and its efficacy, the attorney for the plaintiff might be forced into the difficult position of being compelled to testify concerning the conduct of the examining physician because the incompetent plaintiff would not have the capacity to testify in his own behalf" (*id.* at 75-76 [citations omitted]).

In *Lamendola*, the Third Department found that, unlike the plaintiffs in *Mosel*, the plaintiffs in the case before it had not identified any "such special and unusual circumstances," and thus their request for permission to videotape the examination of the injured plaintiff was properly denied (148 AD2d at 781).

The denial of requests for permission to videotape physical examinations has been upheld by various appellate courts in this state (*see Cooper v McInnes*, 112 AD3d 1120, 1121 [2013] ["Supreme Court acted well within its discretion in prohibiting video or audio recording of the psychological examinations since plaintiffs failed to establish sufficient special or unusual circumstances justifying such recording"]; *Flores v Vescera*, 105 AD3d at 1340 ["plaintiff failed to establish the requisite special and unusual circumstances"]; *Savarese v Yonkers Motors Corp.*,

205 AD2d 463, 463 [1994] [plaintiff's request to videotape or audiotape court-ordered psychiatric examination was properly denied "in light of the fact that counsel will be present during the examination to protect plaintiff's interests"]).

██ Thus, the foregoing case law contemplates that a plaintiff will normally be entitled to have his or her attorney present at an IME, but that permission to employ the additional measure of videotaping the examination will be granted only where the plaintiff establishes the existence of special and unusual circumstances. The latter proposition presupposes that a request for the court's permission to engage in videotaping will be made. What the law of this state does not contemplate is plaintiffs' attorneys taking it upon themselves to surreptitiously videotape an IME, without the knowledge of the examining physician, without notice to the defendants' counsel, and without seeking permission from the court. Contrary to the assertions made by the plaintiff's attorneys in the Supreme Court, surreptitious videotaping of IMEs, without court approval or even notice to the court or opposing counsel, cannot be regarded as an "appropriate tool" or an activity that attorneys should feel free to engage in "all the time."

The plaintiff contends that it was permissible for counsel to videotape the second IME in this case without seeking permission from the Supreme Court because counsel was not recording "the examination qua examination," such that "the examination's validity, effectiveness, and in general the conduct of the examination itself, could be preserved and later utilized." Rather, the plaintiff argues, the recording was made "to preserve the statements and actions of the plaintiff's counsel, so as to protect him from the same sort of false attacks previously made by the defendants' expert." However, the plaintiff's attorney was not a party to this action, and was not in need of "protection." In any event, this argument is belied by the fact that plaintiff's counsel did seek to utilize the recording at trial, precisely for the purpose of attacking the examination's validity and effectiveness and "the conduct of the examination itself." The record reveals that the attorney contemplated that the recording would be used at trial.

For the foregoing reasons, the failure of plaintiff's counsel to seek and obtain the Supreme Court's permission to videotape the second IME was, by itself, a sufficient reason to prohibit the use of the recording at trial. Further compounding the improper conduct of plaintiff's counsel in making the recording

without procuring the court's approval in advance was the failure to disclose the recording to defense counsel prior to trial, which was a clear violation of CPLR 3101. Subdivision (a) of that statute provides that "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action, regardless of the burden of proof, by: (1) *a party*, or the officer, director, member, agent or employee of a party" (CPLR 3101 [a] [emphasis added]). Subdivision (i) provides, in relevant part, as follows:

> "In addition to any other matter which may be subject to disclosure, there shall be full disclosure of any films, photographs, video tapes or audio tapes, including transcripts or memoranda thereof, involving a person referred to in paragraph one of subdivision (a) of this section. There shall be disclosure of all portions of such material, including out-takes, rather than only those portions a party intends to use" (CPLR 3101 [i]).

While CPLR 3101 (i) was enacted for the primary purpose of preventing unfair surprise in situations where a defendant uses surveillance video in an attempt to reveal that a plaintiff's injuries are not as severe as the plaintiff claims they are, the statute employs broad language, which is not limited to such a scenario, but instead requires disclosure of "*any* films, photographs, video tapes or audio tapes" of a party, regardless of who created the recording or for what purpose (CPLR 3101 [i] [emphasis added]; *see Sgambelluri v Recinos*, 192 Misc 2d 777, 779-780 [Sup Ct, Nassau County 2002]). Notably, CPLR 3101 (i) requires "full disclosure," without regard to whether the party in possession of the recording intends to use it at trial (*see Tai Tran v New Rochelle Hosp. Med. Ctr.*, 99 NY2d 383, 388 [2003]).

On appeal, the appellants point out that the video recording of the second IME involved a party, namely the plaintiff, and therefore disclosure of the recording was required under CPLR 3101 (i). The plaintiff does not address this observation, and instead argues that, "since the digital recording here was made of a nonparty, whether it is viewed as having primarily been made of the defendant's medical expert or of Mr. Hackett, disclosure was not required." The plaintiff's premise is incorrect. The videotape is a recording of a medical examination, and the person being examined is the plaintiff. Indeed, the individual who is most prominently depicted in the

recording, and toward whom the recording device is directed for the greatest amount of time, is the plaintiff. Thus, the recording featured, or, at the very least, "involv[ed]" (CPLR 3101 [i]), the plaintiff, "a party" (CPLR 3101 [a] [1]) to the action.

Thus, the failure of the plaintiff's attorneys to disclose to defense counsel the videotape depicting the plaintiff being examined by Dr. Katz violated CPLR 3101. It also violated the spirit of New York's open disclosure policy, which, to a large extent, "was intended to mark an end to the presentation of totally unexpected evidence and to substitute honesty and forthrightness for gamesmanship" (*DiMichel v South Buffalo Ry. Co.*, 80 NY2d 184, 193 [1992]).

The circumstances under which the existence of the secret recording was revealed at trial were unusual and unanticipated. When Dr. Katz testified, based on his notes, that the first IME of the plaintiff (including "a history [being] done") lasted 45 minutes, Ms. Ramirez, the paralegal who attended the IME, apparently had a reaction that was visible to the Supreme Court, and presumably to the jury as well. The usual response would have been for the court to instruct the jury that it should disregard any reactions to a witness's testimony by any other person in the courtroom, and perhaps to admonish the paralegal that such behavior in the presence of the jury is inappropriate. The Supreme Court, however, did not take this approach. Instead, the court stopped the proceedings, excused the jury, and invited plaintiff's counsel to call the paralegal as a witness, since it appeared to the court that "she might differ as to some of the testimony of the doctor." This response to the paralegal's conduct drew open the curtains on Mr. Hackett's improper video recording, leading to the recording being brought to the jury's attention and all of the subsequent events that are at issue on these appeals.

The next unusual and unanticipated event in this case was the cross-examination of Dr. Katz by Mr. Hackett, and the Supreme Court's interference with that cross-examination, which elicited the testimony from Dr. Katz that the plaintiff and the court have persistently characterized as perjury. Dr. Katz was asked how long the second IME took. His response was "[t]hat's uncertain." Under further questioning by Mr. Hackett on that subject, Dr. Katz responded "I don't think I have it recorded," and then "I don't really recall," and then "[q]uite frankly, I don't know." At this point, the court interjected: "I cannot accept an I don't know." This remark was

improper, since it is beyond the province of a court to direct from the bench that a witness change an answer to a question because the court does not like the answer or does not find it believable. After stating that it could not accept Dr. Katz's answer, the court directed the following question to Dr. Katz: "I will have to insist on what your custom and practice would be." Dr. Katz's answer was: "I think in the range of between 10 and 20 minutes would be appropriate."

At this point, we dispel the premise that underlies the plaintiff's arguments on these appeals, and the actions taken by the Supreme Court after declaring the mistrial, namely, the notion that Dr. Katz lied. The record does not reflect that Dr. Katz committed perjury. Dr. Katz was asked how long the second IME took, and his answer was that he did not know. There is no evidence in this record that, at the time Dr. Katz gave that testimony, he actually did know how long the second IME took. Thus, that answer (or series of answers) has not been shown to be untruthful. When Dr. Katz was then asked, by the court, "what [his] custom and practice would be" as to the length of an examination of this type, as noted, Dr. Katz's answer was that he thought that "in the range of between 10 and 20 minutes would be appropriate." There is no support in this record for the proposition that this answer was false. Moreover, even aside from the fact that the Supreme Court did not actually ask Dr. Katz about the length of the particular IME in question, it was improper to force him to specify an exact duration when his answer repeatedly was "I don't know" (see e.g. *People v Samuels*, 284 NY 410, 417 [1940]). Accordingly, the record does not reflect a lie that would support a declaration of perjury by the Supreme Court.

The plaintiff's attorneys insist that Mr. Hackett's video recording shows that the examination lasted one minute and 56 seconds. However, the recording is approximately five minutes in length, and it cannot be determined, from a viewing of the recording, whether the recording captured the entire examination. In other words, it cannot be determined what happened before Mr. Hackett turned his recording device on, and what happened after he turned it off. Moreover, the recording does not account for the time Dr. Katz spent reviewing the plaintiff's fairly extensive medical records, which could arguably be considered part of the IME. In any event, Dr. Katz did not testify as to the actual duration of the second IME, but only as to what his custom and practice would be.

At the hearing on the appellants' post-mistrial motions, the Supreme Court apparently shifted its theory as to what was false about Dr. Katz's testimony, advancing a new theory that Dr. Katz had lied about the quantity or nature of the tests he had performed. This theory had never been proffered by plaintiff's counsel, either as a justification for revealing the secret video recording for the first time in the presence of the jury, or for any other purpose. In any event, this alternate theory was likewise not supported by the video recording.

Furthermore, unusual and unanticipated circumstances warranting a new IME certainly arose from the Supreme Court's accusation, repeated more than 60 times on the record before us, that Dr. Katz "lied" or committed "perjury" during his cross-examination, the court's repeated threats to refer Dr. Katz to the District Attorney's office with a recommendation that he be prosecuted for perjury, and the court's extraordinary efforts to end Dr. Katz's career in the "medical/legal business." The court's efforts in this regard intensified to the point that it apparently resorted to the unorthodox measure of conditioning the vacatur of a $10,000 sanction against each of the appellants' attorneys upon their willingness to adopt the court's view that Dr. Katz had committed perjury. The court also represented to Dr. Katz's counsel that at least one of the appellants' attorneys had "agreed" with the court's view that the doctor had lied, when, in fact, the attorney stated only that he had "no objection" to the court's finding, and that statement was made under circumstances in which the court had been threatening that attorney with sanctions. Under these conditions, it is not surprising that Dr. Katz refuses to testify voluntarily at a retrial.

These circumstances, particularly when viewed collectively, clearly satisfy the requirement that a party seeking an additional IME after the filing of a note of issue must demonstrate the development of unusual and unanticipated circumstances subsequent to the filing of the note of issue. The appellants have been effectively deprived of their expert orthopedic witness in the event of a retrial. Indeed, the Supreme Court's conduct toward Dr. Katz was so thoroughly intimidating, and the manner in which the video recording was made, concealed, and then revealed to the jury had such a chilling effect, that regardless of any corrective measures that might be taken at a retrial, it is likely that Dr. Katz will remain unwilling to testify. Neither the appellants nor their counsel are in any way

responsible for the occurrence of these events, which could not possibly have been anticipated.

The plaintiff, in support of his argument that an additional examination by another orthopedist is not warranted, relies upon this Court's decisions in *Giordano v Wei Xian Zhen* (103 AD3d at 775) and *Carrington v Truck-Rite Dist. Sys. Corp.* (103 AD3d 606 [2013]). In both *Giordano* and *Carrington*, the defendants sought to compel the plaintiff to submit to an additional orthopedic examination because the defendants' respective examining physicians were arrested and temporarily surrendered their medical licenses subsequent to their examination of the plaintiffs and the filing of the note of issue. This Court held that these circumstances did not justify an additional examination by another physician, as the defendants' concern that the plaintiffs might impeach the examining physicians' credibility with this information was not a sufficient basis to direct a second examination (*see Giordano v Wei Xian Zhen*, 103 AD3d at 775; *Carrington v Truck-Rite Dist. Sys. Corp.*, 103 AD3d at 607; *Schissler v Brookdale Hosp. Ctr.*, 289 AD2d at 470 ["The defendants' concern that the plaintiff may impeach the examining physician's credibility with the information that he was disciplined (subsequent to his examination of the plaintiff) is not a sufficient basis to direct a second examination (by another physician)"]; *Futersak v Brinen*, 265 AD2d 452 [1999] [same]).

However, the circumstances of the present case are distinguishable from the cases on which the plaintiff relies. The primary concern in *Carrington* and *Giordano* was that the plaintiffs therein might impeach the credibility of the defendants' examining physicians. By contrast, the concern in the present case primarily involves the unavailability of Dr. Katz, who has indicated that he will not voluntarily testify before the court at a retrial. Additional examinations have been permitted where the prior examining physician has become unavailable. For instance, in *Galdi v Kaliya* (32 Misc 3d 128[A], 2011 NY Slip Op 51256[U] [App Term, 1st Dept 2011]), the Appellate Term held that the unexpected death of the defendants' orthopedist subsequent to his examination of the plaintiff constituted an unusual and unanticipated condition warranting a further physical examination of the plaintiff. In *Rosado v A & P Food Store* (26 Misc 3d 935, 940 [Sup Ct, Westchester County 2009]), the court concluded that the abrupt retirement and relocation out of state of the defendants' examining physician, which occurred after the filing of the note of issue, was an

unanticipated circumstance warranting a further physical examination of the plaintiff by a new physician.

Although Dr. Katz is physically available to testify, his unwillingness to testify voluntarily renders him effectively unavailable to the appellants. Dr. Katz's unwillingness to appear at a retrial is the direct result of the Supreme Court's conduct, which included repeatedly and baselessly accusing him of being a liar, insisting that he retain an attorney, threatening to refer him to the District Attorney's office with a recommendation that he be prosecuted for perjury, and expressly stating that it was the court's objective to end his career in the "medical/legal business." Under these circumstances, where Dr. Katz is not at fault—and the appellants and their attorneys are most certainly not at fault—for his unwillingness to testify, Dr. Katz must be deemed unavailable to the appellants, and the circumstances must be deemed unusual and unanticipated, thus warranting a new IME by a different orthopedist of the appellants' choosing.

Furthermore, while the appellants could seek to subpoena Dr. Katz to testify, this would place Dr. Katz in an adversarial posture with the appellants. In this regard, this Court has also permitted an additional medical examination where there was evidence of hostility between the examining physician and the defendant's attorney (see *Miocic v Winters*, 75 AD2d 887 [1980]). In *Miocic*, the defendant sought an additional examination of the plaintiff by a different physician after learning that the first physician allegedly was a close friend of plaintiff's counsel, and had animosity toward defense counsel. This Court held that "[n]o matter how objectively and thoroughly [the physician] might now act, such actions would necessarily be tainted with the appearance of bias and partiality," and that the defendants "should not be compelled to rely upon a physician who is openly hostile to defense counsel and is a personal friend of plaintiffs' counsel" (*id*. at 888).

Notably, as the Supreme Court anticipated, its condemnation of Dr. Katz has had an effect on other cases. In several recent cases in which Dr. Katz was retained to perform IMEs, courts have been presented with requests for new IMEs based on the events that transpired in the present case. In *Atchison v Metropolitan Enters., Inc.* (43 Misc 3d 1207[A], 2014 NY Slip Op 50521[U] [Sup Ct, Kings County 2014]), the plaintiff had submitted to an orthopedic examination conducted by Dr. Katz at the request of the insurance carrier of one of the defendants. After subsequently learning of Justice Hart's remarks regard-

ing Dr. Katz in the present case, the defendants in *Atchison* moved to compel the plaintiff to submit to a further independent orthopedic examination, arguing, among other things, that "Justice Hart's broad comments about Dr. Katz have significant repercussions," and that "it is impossible to receive a fair trial if [the defendants] have no choice but to rely solely on Dr. Katz's orthopedic examination results and his opinion" (43 Misc 3d 1207[A], 2014 NY Slip Op 50521[U], *3). They further noted that "Justice Hart's comments have 'permeated the legal community and . . . garnered . . . media attention'" (*id.*). The Supreme Court, in denying the defendants' motions, cited *Carrington v Truck-Rite Dist. Sys. Corp.* (103 AD3d 606 [2013]) and *Giordano v Wei Xian Zhen* (103 AD3d 774 [2013]), and held that the "defendants' fear that jurors will be more concerned with the integrity or credibility of Dr. Katz than with the truth of plaintiff's injury allegations is not a sufficient reason for this court to order plaintiff to submit to an additional IME over a year after filing a note of issue" (*Atchison v Metropolitan Enters., Inc.*, 43 Misc 3d 1207[A], 2014 NY Slip Op 50521[U], *6). In *Rios v 1146 Ogden LLC* (2014 NY Slip Op 32097[U] [Sup Ct, Bronx County 2014]), the defendants, on whose behalf Dr. Katz had conducted an IME of the plaintiff therein, similarly moved to compel the plaintiff to submit to an additional physical examination based on Justice Hart's comments in the present case. However, the Supreme Court, relying on this Court's decision in *Carrington*, denied the defendants' motion (*see id.*; *Lorentty v Muniz*, 2013 WL 7806421, *1 [Sup Ct, Queens County 2013] [denying the defendant's motion for an order permitting a second orthopedic independent medical examination of the plaintiff where the defendant's initial orthopedist, Dr. Katz, who previously examined the plaintiff, "was severely criticized by the Honorable Duane A. Hart, J.S.C."]).

In sum, given the avalanche of errors that occurred in this case, we find that the appellants satisfied their burden of demonstrating unusual and unanticipated circumstances justifying an additional medical examination of the plaintiff by an orthopedist to be designated by them. Under the particular circumstances of this case, a second examination by a different physician is necessary "to ensure that the focus of the medical testimony will be on the nature and extent of plaintiff's alleged injuries, rather than on any taint or irregularity [surrounding] the [prior] examination" (*Orsos v Hudson Tr. Corp.*, 95 AD3d at 526).

Accordingly, the Supreme Court abused its discretion in denying those branches of the appellants' motions which were to compel the plaintiff to submit to an additional orthopedic examination.

## 2. Imposition of Costs Against Plaintiff's Counsel

■ As the appellants correctly contend, the necessity for a mistrial was created by the conduct of plaintiff's counsel, and was not to any extent attributable to any conduct of the appellants or their counsel. First, as discussed above, plaintiff's counsel surreptitiously created a video recording of the second IME without providing any notice to the court or defense counsel, much less obtaining the court's approval, as is required. Had counsel obtained approval, or at least provided notice, of the videotaping, the mistrial would not have occurred. Second, as discussed above, plaintiff's counsel compounded the prejudice to the appellants by improperly failing to disclose the video recording to defense counsel, as was clearly required under CPLR 3101 (i). Had counsel disclosed the recording, the mistrial would not have occurred. Third, plaintiff's counsel chose to reveal the existence of the recording to the jury in a way that maximized its dramatic effect, and was unfair to the appellants. Notably, Mr. Hackett admitted that he consulted with other attorneys prior to his paralegal's testimony regarding the admissibility of the undisclosed video recording. Mr. Hackett waited until his re-direct examination of his paralegal to reveal the recording's existence, even though Ms. Ramirez had not been asked any questions on cross-examination regarding the duration of the second IME. This was improper.

In opposing those branches of the appellants' motions which sought an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130-1.1, the plaintiff's only argument as to why the appellants should be held accountable for precipitating the mistrial, and plaintiff's counsel should not be, is that the mistrial was caused by Dr. Katz's act of lying during his cross-examination. The Supreme Court appears to have ultimately adopted this view. This position is unsupportable since, as discussed above, Dr. Katz did not lie. Moreover, even if Dr. Katz had lied, that act would not be the proximate cause of the mistrial.

Thus, we conclude that the conduct of plaintiff's counsel was frivolous within the meaning of 22 NYCRR 130-1.1, and that the Supreme Court abused its discretion in denying those branches of the appellants' motions which were for an award of

costs against plaintiff's counsel. The appellants are entitled to recover from Patrick J. Hackett and Constantinidis & Associates the costs they incurred in participating in the first trial on the issue of damages, as well as the costs they incurred in making and litigating the motions at issue on these appeals and in pursuing these appeals. Upon remittal, the Supreme Court should conduct a hearing to determine the total amount of such costs, as well as the proper apportionment of those costs as between Mr. Hackett and Constantinidis & Associates (*see Preferred Equities Corp. v Ziegelman*, 190 AD2d 659, 660 [1993]).

### 3. Disqualification of Plaintiff's Counsel

■ That branch of Amsterdam's motion which was to disqualify Mr. Hackett and Constantinidis & Associates as counsel for the plaintiff was based on the premise that, as the videographer who made the recording of the second IME, Mr. Hackett would be required to authenticate the recording, and thus he had become a potential witness in the case. As part of our determination of the other branches of the appellants' motions, however, we have concluded that it was improper to make the recording and to fail to disclose it. Accordingly, that recording was not admissible at the original trial, and would not be admissible at any retrial. Indeed, even if the plaintiff could still provide adequate notice of the recording, as required by CPLR 3101 (i), in time for a retrial, the fact that the recording was improperly made in the first instance would require its exclusion from evidence.

Thus, since the video recording would not be admissible at any retrial, there is no possibility that Mr. Hackett would be called upon to authenticate the recording. Accordingly, that branch of Amsterdam's motion which was to disqualify plaintiff's counsel should have been denied as academic.

### Conclusion

The mistrial that was declared in this case, as well as the effective unavailability of Dr. Katz as a witness for the appellants at a retrial, was caused by the conduct of plaintiff's counsel in making and failing to disclose the video recording of the second IME, as well as the conduct of the Supreme Court, and was not caused, to any extent, by any conduct of the appellants or their counsel. Consequently, the appellants are entitled to an additional medical examination of the plaintiff, to be conducted by an orthopedist designated by them, as well as the costs they incurred in the first trial, and the costs they incurred

in making and litigating the motions at issue on these appeals and in pursuing these appeals, to be paid by Patrick J. Hackett and Constantinidis & Associates. All further proceedings in this case should be conducted before a different Justice of the Supreme Court.

Accordingly, the appeals by the defendant Ibex Construction, LLC, from the order and the amended order are dismissed, as those orders were superseded by the amended order and the second amended order, respectively, the second amended order is reversed insofar as appealed from, on the law, the order and the amended order are vacated, those branches of the motion of the defendant Ibex Construction, LLC, and the separate motion of the defendant Amsterdam & 76th Associates, LLC, which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130-1.1, are granted, that branch of the motion of the defendant Amsterdam & 76th Associates, LLC, which was to disqualify plaintiff's counsel based on a violation of rule 3.7 of the Rules of Professional Conduct is denied as academic, and the matter is remitted to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith.

MASTRO, J.P., MILLER and MALTESE, JJ., concur.

Ordered that the appeals by the defendant Ibex Construction, LLC, from the order and the amended order are dismissed, as those orders were superseded by the amended order and the second amended order, respectively; and it is further,

Ordered that the second amended order is reversed insofar as appealed from, on the law, the order and the amended order are vacated, those branches of the motion of the defendant Ibex Construction, LLC, and the separate motion of the defendant Amsterdam & 76th Associates, LLC, which were for leave to have the plaintiff re-examined by an orthopedist of their own choosing, and for an award of costs against plaintiff's counsel pursuant to 22 NYCRR 130-1.1, are granted, that branch of the motion of the defendant Amsterdam & 76th Associates, LLC, which was to disqualify plaintiff's counsel based on a violation of rule 3.7 of the Rules of Professional Conduct is denied as academic, and the matter is remitted to the Supreme Court, Queens County, before a different Justice, for further proceedings consistent herewith; and it is further,

Ordered that the appellants are awarded one bill of costs.